**IN THE COURT OF APPEALS OF IOWA**

No. 15-1055
Filed September 23, 2015

**IN THE INTEREST OF T.J.,**
**Minor Child,**

**M.J., Father,**
**Appellant.**
_____

Appeal from the Iowa District Court for Butler County, Peter B. Newell, District Associate Judge.

A father appeals adjudicatory and dispositional orders entered by the district court. **AFFIRMED.**

Mark Milder, Waverly, for appellant father.

Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney General, and Greg Lievens, County Attorney, for appellee State.

Lucas Jenson, Parkersburg, attorney and guardian ad litem for minor child.

Considered by Potterfield, P.J., and Doyle and Bower, JJ.

**DOYLE, Judge.**

A father appeals the district court's order adjudicating his child in need of assistance, claiming clear and convincing evidence did not support the statutory ground for adjudication. The father also appeals the court's dispositional order continuing removal of the child from his custody, claiming continued removal did not constitute the least restrictive disposition under the circumstances. We affirm.

## I.  *Background Facts and Proceedings*

The father's parental rights with regard to his seventeen-year-old daughter T.J. are at issue in this proceeding. T.J. was born in 1998. Her mother is deceased. She lived with the father, her step-mother, and four step-siblings. T.J. has been diagnosed with pervasive development disorder, attention deficit hyperactivity disorder, and mood disorder, and she was evaluated to have mild intellectual deficiency with a full scale IQ of 60.

The family most recently came to the attention of the Iowa Department of Human Services (DHS) in September 2014, upon reports that the father had struck T.J. causing her nose to bleed. DHS initiated a child abuse assessment, which resulted in a founded report of physical abuse. There was a prior founded report of physical abuse to T.J. by the father in 2013, and DHS had also investigated the family upon reports of abuse by the father in 2011. The father denied hitting the child; his explanation for T.J.'s injury was that she picked her

nose a lot and could have caused her own nose to bleed. The father claimed the DHS reports were inaccurate, but did not take steps to challenge them.[1]

For the next several months, DHS attempted to meet with the family. The father was not cooperative with service providers. In November 2014, the father told DHS "not to come back to the home; he did not want services; wasn't willing to participate, and [DHS] wasn't welcome back at his home again." On one occasion, the father approached the service providers outside the home "pointing his finger at the provider, and said, I told you not to show up here again." The father did not return phone calls from service providers. The family refused to sign releases to allow DHS to assist in finding appropriate mental health care for the child. The child was not enrolled in school.

The family believed the child should be placed in a residential facility due to her behavioral and mental health needs. The family reported T.J. had acted out aggressively toward herself and others. As a service provider explained, "[T]hey agreed that more supportive placement is in [the child]'s best interests. [But t]hey would prefer to seek that out themselves." The family looked into residential placement options for the child, but the wait lists were too long. In January 2015, the child's step mother contacted DHS about the child, stating she "needed the child out of the home, but [that the father] wouldn't allow [DHS involvement]."

In January 2015, the State filed a petition alleging the child was in need of assistance (CINA) pursuant to Iowa Code section 232.2(6)(b), (c)(1), and (f)

---

[1] A service provider had a conversation with the father and step-mother in November 2014, "explaining to them how they could appeal the report; what steps they needed to take; but [the father] was not willing or wanting to appeal the report."

(2015).[2]  An adjudicatory hearing took place in March, after twice being rescheduled.[3]  DHS and the guardian ad litem recommended adjudication. DHS's February 2015 case report to the court noted the family's lack of cooperation made it unable for service providers to "fully assess [T.J.'s] risk of maltreatment" and opined the child had a "significant risk of future maltreatment." The case report also noted the child "has significant mental health needs that require additional resources to ensure her safety," but the family is "unwilling to allow the DHS into their home."  Finally, the service provider noted the child's "educational needs at this time are not being met appropriately."

The father's attorney called the child to testify at the hearing and questioned the child about the alleged abuse by the father.  In her testimony, T.J. stated, "He did not punch me; he hit me" "us[ing] three fingers and hit my nose." On cross-examination, the child explained:

> Q. [H]e did hit you?  A. Yup.
> Q. Okay.  And that made your nose bleed?  A. Uh-huh.
> Q. Okay.  Has your dad hit you before?  A. Yes, he has.
> Q. Okay.  About how many times?  A. I do not know.
> Q. Like, too many to count?  A. (Witness nodded head affirmatively.)
> Q. So, he hit you so many times you can't count them all?
> A. Right.

---

[2] Section 232.2(6)(b) involves a child "[w]hose parent, guardian, other custodian, or other member of the household in which the child resides has physically abused or neglected the child, or is imminently likely to abuse or neglect the child."  Section 232.2(6)(c)(1) involves a child "[w]ho has suffered or is imminently likely to suffer harmful effects as a result of . . . [m]ental injury caused by the acts of the child's parent, guardian, or custodian."  Section 232.2(6)(f) involves a child "[w]ho is in need of treatment to cure or alleviate serious mental illness or disorder, or emotional damage as evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others and whose parent, guardian, or custodian is unwilling to provide such treatment."

[3] The hearing in January was continued upon the court being advised the family was attempting to address T.J.'s mental health needs without DHS intervention.  The February hearing was continued to due weather concerns.

The child's step-mother testified T.J. lied regularly and hurt herself "every day. It's a daily occurrence." She further explained, "At least once a week she makes herself bleed, but she hurts herself every day." The father did not testify.

On March 9, 2015, the court entered an order adjudicating the child in need of assistance under Iowa Code section 232.2(6)(b) and (f). In reaching its conclusion, the court noted the child's testimony that the father "had hit her many times"; the step-mother's testimony that the child was not being schooled; the child's unaddressed mental health needs; the parents' failure to find a residential treatment facility for the child on their own since 2014; and the parents' unwillingness to cooperate with DHS. The court ordered DHS "to begin to immediately seek an out-of-home placement for this child," and stated it would "authorize this child's removal from the parental home" "upon being notified that an out-of-home placement is available for this child."

DHS's next contact with the family was on March 13, at the family home. The father was "very rude and disrespectful," and he refused to communicate except to tell service providers "he was not willing to work with DHS as 'they have done nothing but lied.'"

On March 23, the father took the child to the Waverly Health Center and made an application for emergency hospitalization. The father did not contact DHS, and he refused to sign release forms to allow DHS to learn the child's condition.[4] Separate hospitalization proceedings were initiated and a magistrate authorized the child's placement in a hospital. The father did not tell his attorney

---

[4] The father later agreed to sign the forms.

or DHS about the hospitalization or his newly-appointed attorney about the juvenile proceedings.

On March 27, a hospitalization review hearing was held. DHS appeared and advised the court of the pending juvenile proceedings and requested the child be removed from the home. The court dismissed the hospitalization proceedings and authorized removal of the child from the parental home, finding removal "necessary based upon a determination that continuation in the home would be contrary to the welfare of this Child." *See* Iowa Code § 232.78(1)(b) (authorizing the court to enter an ex parte removal order if the child's immediate removal is necessary to avoid imminent danger to the child's life or health). The father did not appeal from that order.

A dispositional hearing took place on April 22, 2015. Meanwhile, the child was placed in family foster care, where she "thrived." She began attending high school and grew attached to her foster parents and their children. The child reported to service providers that she felt "happy" and "safe" with her foster family. She further reported that she "loved" school, had made new friends, liked all her teachers, and was able to attend the prom. The child was pleased her foster mother had nicknamed her "grasshopper." Exhibit A presented to the court by the guardian ad litem was a letter from the child stating in part, "I want the Judge to know . . . That I want to stay at [foster parents] house because they are nice and they love me and they care about me." DHS recommended T.J. remain in family foster care, as opposed to being placed in residential treatment.

The child declined visitation with the father "after she attempted to [hug him] and he didn't hug her back." The father was unresponsive to the child

during visits. The father requested the child be returned home with no services provided of any kind.

On June 3, 2015, the court entered a dispositional order finding the father "has been uncooperative with [DHS] and their service providers" and "has refused to communicate" with DHS. The court further found the father "has been physically, emotionally and verbally abusive" to the child, who once out of his home, had thrived. The court ordered the child to remain in family foster care and participate in mental health services as recommended by DHS.

The father now appeals from the adjudicatory and dispositional orders entered by the district court.[5]

## II.    Adjudication

The father contends the court erred in adjudicating T.J. a CINA pursuant to section 232.2(6)(b) and (f) because "there was not clear and convincing evidence that the child had been physically abused nor clear and convincing evidence that the father was unwilling or unable to meet the child's mental health needs."

We conduct a de novo review of CINA proceedings. *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). "In reviewing the proceedings, we are not bound by the juvenile court's fact findings; however, we do give them weight." *Id.* Our

---

[5] We limit our review to the father's challenges with regard to the adjudicatory and dispositional orders entered by the district court (Issues I and IV). The father also raises several challenges with regard to the child's removal at the hearing following her emergency hospitalization (Issues II and III), but he never appealed the child's removal and that issue is moot. *See In re A.M.H.*, 516 N.W.2d 867, 871 (Iowa 1994) ("Custody of the child was placed with DHS under the dispositional order. Any error committed in granting the temporary ex parte order cannot now be remedied. We cannot go back in time and restore custody based on alleged errors in the initial removal order.").

primary concern is the best interests of the child. *Id.* "CINA determinations must be based upon clear and convincing evidence." *Id.* at 41.

We may affirm if either of the grounds found by the court support the adjudication. *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995). Upon our de novo review of the record, we find clear and convincing evidence supports adjudicating the child in need of assistance on the grounds that the father has physically abused or neglected the child, or is imminently likely to abuse or neglect the child. The child reported to service providers that the father hit her and made her bleed. The child testified at the adjudicatory hearing that father has hit her more times than she could count. Between 2011 and 2014, DHS initiated several child abuse assessments on the family, which resulted in two separate founded reports of physical abuse to T.J. by the father. The father did not challenge those reports, but denied having abused the child. DHS believed the child was at risk for future harm in the family home. We affirm the juvenile court order adjudicating the child in need of assistance (CINA) pursuant to section 232.2(6)(b).

### III.    *Disposition*

The father contends "[t]here was insufficient evidence to warrant continued removal of the child at the disposition hearing and the Court erred in failing to return the child to the parental home."

We review this issue de novo. *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001). The court must make the least restrictive disposition that is appropriate considering all the circumstances of the case. *See* Iowa Code § 232.99(4). Custody of a child should not be transferred from the child's home unless the

court finds there is clear and convincing evidence "the child cannot be protected from some harm which would justify the adjudication of the child as a child in need of assistance and an adequate placement is available." *See id.* § 232.102(5)(a)(2).

"[T]he court must make a determination that continuation of the child in the child's home would be contrary to the welfare of the child, and shall identify the reasonable efforts that have been made." *Id.* § 232.102(5)(b). The court's determination "must be made on a case-by-case basis." *Id.* Upon our de novo review of the record, we agree with the court's decision. The record is replete with evidence that would justify the child's adjudication as CINA if she were to remain in the family home. Aside from the obvious concerns about the father's refusal to cooperate in finding mental health treatment for the child, or the fact that at the time DHS began the instant investigation the child was not being schooled, the fact remains that child was at risk for future physical harm by the father in the family home. The father's attempts to conceal the family from DHS intervention, his denial of physical abuse, and his aggression toward caseworkers are also troubling. Under these facts, if the child were ordered to return to the custody of the father, we are not convinced the father would follow through to address the child's mental health concerns or discontinue hitting the child.

Our ultimate concern is with the best interests of the child. *In re J.E.*, 723 N.W.2d 793, 800 (Iowa 2006). T.J. has thrived since her removal from the family home and placement in family foster care. She has expressed her desire to remain in her current placement; DHS agrees she should remain in family foster

care.  Here, we are convinced it is in T.J.'s best interests to be in a placement free from physical, emotional, and verbal abuse and neglect.  We affirm the dispositional order entered by the court.

**AFFIRMED.**